Orlando **FUENTES** and International Brotherhood of Correctional Officers, Local No. 248, Plaintiffs

v.

**HAMPDEN COUNTY SHERIFF'S DEPARTMENT, Michael Ashe, as Sheriff, and Diane Jimenez, Defendants**

No. CIV.A. 02–30173MAP.

United States District Court, D. Massachusetts.

March 31, 2006.

Christopher M. Browne, National Association of Government Employees, Springfield, MA, for International Brotherhood of Correctional Officers, Local No. 248, Orlando Fuentes, Plaintiffs.

Michael P. Clancy, Falls, MA, for International Brotherhood of Correctional Officers, Local No. 248, Orlando Fuentes, Plaintiffs.

Edward J. McDonough, Jr., Egan, Flanagan & Cohen, PC, Springfield, MA, for Hampden County Sheriff's Dept., Diane Jiminez, Michael Ashe, Defendants.

Michael P. Sheridan, Hampden County Sheriff's Department, Ludlow, MA, for Hampden County Sheriff's Dept., Diane Jiminez, Michael Ashe, Defendants.

*MEMORANDUM AND ORDER REGARDING REPORT AND RECOMMENDATION RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

(Docket Nos. 37 & 42)

PONSOR, District Judge.

## I. *INTRODUCTION*

Plaintiffs Orlando Fuentes and the International Brotherhood of Correctional

Officers, Local No. 248 (the "Union"), brought an eleven-count complaint against Defendants Hampden County Sheriff's Department ("Sheriff's Department"), Michael Ashe in his official capacity as Sheriff, and Diane Jimenez.

Three sets of claims now remain in the case: (1) Fuentes' claim against Jimenez for defamation (Count III); (2) the Union's civil conspiracy claim against all Defendants (Count X); and (3) First and Fourteenth Amendment claims against all Defendants in their official capacities (Counts V, VII, and IX). The court dismissed all other claims in the case on June 25, 2004.

Defendants filed a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56, arguing that no genuine issues of material fact remained for trial. Defendants' motion was referred to Magistrate Judge Kenneth P. Neiman ("Magistrate Judge"), who issued a Report and Recommendation suggesting that Defendants' motion be allowed with respect to all claims except one portion of Plaintiffs' First Amendment causes of action.

Defendants thereafter filed an objection to the Report and Recommendation, alleging that the Magistrate Judge erred in failing to recommend that summary judgment be allowed on all remaining claims. Although Plaintiffs have opposed Defendants' objection, they do not themselves separately object to the Report and Recommendation.

Defendants' objection requires this court to analyze the relevant issues *de novo.*

Based on this review, the court will adopt the Magistrate Judge's recommendation and grant summary judgment on all counts except one portion of the First Amendment claims.

## II. *STANDARD OF REVIEW*

Summary judgment is appropriate where there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party," and a fact is "material" if "it is one that might affect the outcome of the suit under governing law." *Velez–Rivera v. Agosto–Alicea,* 437 F.3d 145 (1st Cir.2006).

## III. *FACTS*

The parties have not objected to the Magistrate Judge's summary of the facts. Additional background facts can be found in the Report and Recommendation on Defendants' Motion to Dismiss. (*See* Dkt. No. 13.) The facts are summarized below.

At all relevant times, Plaintiff Fuentes was an employee of the Sheriff's Department and a shop steward of the Union. In late July 2002, Fuentes heard a rumor that a certain Primary Captain was engaging in sexual harassment. Fuentes mentioned the rumor to Kathy Silva, a co-worker and member of the Union board. Fuentes also made inquiries with other employees regarding the Primary Captain's management style. Fuentes determined that he did not have enough information to report the matter to management.

On July 8, 2002, Sergeant Derek Woods overheard Silva discussing the rumor with another co-worker. He thereafter reported the rumor to Assistant Deputy Superintendent John Kenney, who then asked Woods to submit a written incident report. On July 21, 2002, Kenney contacted Defendant Jimenez, the Assistant Deputy Superintendent of Personnel. Jimenez then conducted meetings with Fuentes, Silva, Kenney, and a Union representative, during which Fuentes and Silva gave conflicting statements.

On August 16, 2002, Fuentes received a letter (the "Letter") suspending him without pay for five days. The basis for his suspension was identified as "your failure to follow the clear contract immediate reporting requirement,[1] your lack of candor during the investigation, your conducting 'union' or personally motivated business on work time without permission and engaging in conduct under the guise of an investigation that was reckless and damaging to the reputation of a supervisor." Fuentes grieved the suspension and filed this lawsuit.

## IV. *DISCUSSION*

### A. *The Defamation, Civil Conspiracy, and Due Process Claims*

The Magistrate Judge has recommended that summary judgment be allowed on Count III (defamation). He concluded that Defendants had introduced sufficient evidence to establish that Jimenez's actions were privileged as a matter of law. *See Masso v. United Parcel Serv. of Am.,* 884 F.Supp. 610, 622 (D.Mass.1995). Moreover Fuentes could not name a single individual who believed that his reputation had been damaged by his suspension claim. *See Draghetti v. Chmielewski,* 416 Mass. 808, 626 N.E.2d 862, 866 (Mass. 1994).

The Magistrate Judge has also recommended that summary judgment be entered in favor of Defendants on Count X (civil conspiracy). In his deposition, Fuentes conceded the absence of any information regarding a conspiracy; the only other potential evidence regarding this claim is too tenuous to support a civil conspiracy claim.

It should be noted that although the Report and Recommendation mentions only the Sheriff's Department, Count X is a claim against all Defendants. (*See* June 25, 2004, Endorsed Order (allowing Plaintiffs' Motion to Amend).) This does not affect the analysis in the case, and the Magistrate Judge's reasoning should be read to apply equally to all Defendants.

■ Finally, the Magistrate Judge has recommended that Defendants' motion be allowed with respect to all Due Process claims (Counts V and VII). As this court noted earlier in disposing of Defendants' Motion to Dismiss, "the Due Process claim must be dismissed if, after discovery, it materializes that there is no official policy or custom which caused Constitutional injury to Fuentes." *See Fuentes v. Hampden Cty. Sheriff's Dep't.,* No. 02–30173, 2004 WL 1490434, at *5 n. 3 (D.Mass. June 25, 2004) (citing *Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Fuentes admitted at his deposition that there is no evidence of any such official policy at the Sheriff's Department, and Plaintiffs have not offered any other evidence to rebut this fact.

The Magistrate Judge also found that Fuentes was afforded all the process that was due, based on the Defendants' undisputed facts.

Neither party has offered any objection to the Magistrate Judge's recommendation that summary judgment enter in Defendants' favor with regard to the defamation, civil conspiracy, and Due Process claims. The court will adopt the Magistrate Judge's persuasive analysis with respect to these issues.

---

**1.** Article 5, Section 3 of the collective bargaining agreement states that "[e]mployees who . . . have information about an incident or incidents of sexual harassment must report the same in writing immediately." (Dkt. No. 37, Defs.' Statement Material Facts ¶ 8.)

## B. *The First Amendment Claims*

Defendants have objected to the Magistrate Judge's recommendation that summary judgment be granted only on a portion of the First Amendment issues. These include Counts V and VII, in which Fuentes seeks judgment against Defendants for violation of his First Amendment rights. In addition, Count IX is the Union's equitable relief claim against the Sheriff's Department for free speech violations. The parties address all three counts together.

▮ The First Circuit uses a three-part test to analyze First Amendment freedom of speech claims brought by public employees against their employers. *Tang v. R.I. Dep't. of Elderly Affairs*, 163 F.3d 7, 12 (1st Cir.1998). First, the court must decide whether the employee's speech concerned "matters of public concern." *Id.* Next, the court must perform a balancing test and "weigh the strength of the employee's and the public's First Amendment interests against the government's interest in the efficient performance of the workplace." *Id.* (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Finally, the employee must demonstrate that "the protected expression was a substantial or motivating factor in an adverse employment action." *Id.*

### 1. *Speech Involving a Matter of Public Concern*

▮ The first task in evaluating Fuentes' First Amendment claim is to identify the speech at issue. Plaintiffs fail to do so. (*See, e.g.*, Dkt. No. 39, at 11 ("Fuentes' speech, a mere snippet, concerned the topic of sexual harassment by a supervisor against a female co-employee").) The record indicates that Fuentes discussed the alleged sexual harassment with both the unidentified colleague who first made him aware of the rumor and with Silva. In addition, Fuentes made general inquiries among his colleagues regarding the management style of the alleged harasser.

▮ A public employee's speech is eligible for First Amendment protection "only when the employee speaks as a citizen upon matters of public concern rather than as an employee upon matters only of personal interest." *City of San Diego v. Roe*, 543 U.S. 77, 83, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (quotations omitted). During his deposition, Fuentes stated repeatedly and unequivocally that his inquiries regarding the Primary Captain's management style were personally-motivated and unrelated to the sexual harassment rumor. (*See, e.g.*, Dkt. No. 38, Fuentes Dep. 70:23–71:5, Mar. 2, 2005 (denying that information of the rumor triggered the later inquiries); *id.* at 72:15–19 (testifying that conversations with other staff members were "unrelated" to the sexual harassment rumor); *id.* at 121:5–10 (noting that the inquiries were personal, "just casual conversation").) Fuentes also repeatedly denied that he was conducting an investigation into the Primary Captain or acting in his capacity as a union steward. (*See, e.g.*, *id.* at 71:15–16 (denying that he was conducting an investigation); *id.* at 78:21–79:2 (confirming the accuracy of an incident report in which Fuentes stated that he was not acting in his union capacity when asking questions about the Primary Captain).) Finally, Fuentes also testified that when he made inquiries regarding the Primary Captain, he did not attempt to corroborate the rumor or even mention it at all. (*See id.* at 95:15–18.) Thus, Fuentes' questions regarding the Primary Captain are clearly private speech and therefore ineligible for First Amendment protection.

■ Fuentes' remaining speech—his initial conversation about the rumor and the subsequent discussion with Silva—cannot be dismissed as easily. Defendants argue that Fuentes testified during his deposition that all relevant speech in this case was personal. However, Defendants rely entirely on those portions of the deposition in which Fuentes was asked about his conversations regarding the Primary Captain's management style.[2] By contrast, Fuentes did *not* testify either that his initial conversation or the discussion with Silva were personally-motivated. (*See, e.g.,* Fuentes Dep. 65:5–67:23; *see also id.* at 90:2–102:20 (discussing the discrepancy in the accounts given by Silva and Fuentes).) Rather, Fuentes testified that in his first brief conversation, he advised his informant

if it did happen ... it needs to be reported. If that female officer is afraid because it deals with a supervisor, she can turn it into the union board and they will forward it to administration for her.

(Fuentes Dep. 60:18–23; *see also id.* at 62:13–23.)

Regarding his conversation with Silva, Fuentes stated:

To the best of my recollection, I spoke to her, I think it was on my way to lunch or something of that manner and I explained to her because I told an officer that, you know, if the officer who was allegedly wronged or harassed has re- ported it to union board ... to let everybody else on the board know that they need to forward that to the administration, and I explained to her what the report would have been about.

(Fuentes Dep. 65:11–21.)

A reasonable juror could find that these initial conversations involved a matter of public concern. While conversations about sexual harassment need not necessarily touch on a public concern, "the content, form, and context" of Fuentes' statements, suggest that he was engaged in more than mere rumor-mongering. *See Rankin v. McPherson,* 483 U.S. 378, 385, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (quoting *Connick v. Myers,* 461 U.S. 138, 148, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). In both cases, Fuentes was conveying information about Union policy regarding sexual harassment in the workplace. *See, e.g., Boddie v. City of Columbus,* 989 F.2d 745, 750 (5th Cir.1993) (noting that "speech in the context of union activity will seldom be personal"); *Hall v. Mo. Highway & Transp. Comm'n,* 235 F.3d 1065, 167–68 (8th Cir.2000) (complaint of discrimination against older women related to matter of public concern); *see also Bennett v. City of Holyoke,* 230 F.Supp.2d 207, 224 (D.Mass. 2002) (finding that police officer's statements regarding corruption and racism were on matters of public concern), *aff'd,* 362 F.3d 1 (1st Cir.2004).

---

**2.** Defendants' repeated citations to the deposition at 78:22 are somewhat misleading. That is the point at which Fuentes responded in the affirmative to a question asking him to confirm that he was not acting in his union capacity when he was "discussing [the Primary Captain] with other staff." (*See* Fuentes Dep. 78:21–79:2.) This comment might imply, as Defendants suggest, that any conversation with "other staff," including Silva and the initial informant, was personally-motivated. However, taken in context, the question clearly applies to Fuentes' later inquiries re- garding management style. The relevant line of questioning began with a question that asked Fuentes to "leav[e] aside Kathy Silva and leav[e] aside the unknown officer" in order to focus on "discussions with seven or eight [ ] other staff members." (*See* Fuentes Dep. 69:5–9; *see also id.* at 69–79.) Thus Fuentes' comment is best understood as an answer regarding his inquiries about management style. (*See also* Fuentes Dep. 79:3–5 ("other staff" question was followed directly by a question regarding "the Captain's management style).)"

### 2. *Pickering Balancing Test.*

The *Pickering* balancing test requires the court to weigh the strength of the employee's First Amendment interests against the government's interest in the efficient performance of the workplace.

■ Defendants argue that their interest in following the Collective Bargaining Agreement, maintaining staff respect and discipline, and limiting unauthorized investigations clearly outweighs any First Amendment rights Fuentes may have in this case. Defendants rely entirely on *Mulvihill v. Top–Flite Golf Co.,* 335 F.3d 15 (1st Cir.2003), for the proposition that courts must give employers wide latitude to take action regarding sexual harassment, due to the significant role employers play in enforcing the relevant statutory scheme. Defendants' reliance is misplaced. First, *Mulvihill* concerns the Labor Management Relations Act and not the First Amendment. *See id.* Second, the facts of the case differ significantly. In *Mulvihill,* the employer terminated the plaintiff for sexual harassment after he was accused of spreading false rumors about the sexual activity of a fellow employee. *See id.* at 18. Thus the employer was taking action against the alleged harasser. In the present case, by contrast, Fuentes alleges that he was disciplined after he discussed another employee's harassment. *Mulvihill* cannot sustain a reading that suggests that an employer's wide latitude with regards to enforcement of sexual harassment laws includes a wide latitude to discipline employees who discuss an allegation that a fellow employee has engaged in sexual harassment.

Defendants might argue, although they have not done so explicitly in this case, that "[t]he importance of discipline, maintenance of harmony among co-workers, and close working relationships requiring personal loyalty and confidence is greater in the context of a law enforcement agency ... than it might be in another type of government agency." *Guilloty Perez v. Pierluisi,* 339 F.3d 43, 53 (1st Cir.2003). Defendants bear the burden, however, of demonstrating that work disruptions actually occurred because of Fuentes' speech, *see id.* at 54, and they have failed to offer evidence on this point.

Fuentes' First Amendment interests are related to the fact that his speech involves a matter of public concern. As noted above, his speech conveyed information about Union policy regarding sexual harassment in the workplace. *See, e.g., Guilloty,* 339 F.3d at 53 (describing "substantial public interest" in an employee's reports of supervisor misconduct). Thus Fuentes' First Amendment interests outweigh Defendants' speculative interests.

### 3. *A Substantial or Motivating Factor in an Adverse Employment Action*

■ Plaintiff must demonstrate that the relevant speech was a substantial or motivating factor in his suspension. Fuentes received formal notice of his suspension in a letter written by Jimenez for the Sheriff's Department. Jimenez began the letter by recounting the relevant background facts, referring first to Fuentes' initial discovery of the sexual harassment allegation, then describing the conversation between Fuentes and Silva. (*See* Dkt. No. 38, at 216.) In the subsequent paragraph, she referred once again to the conversation between Fuentes and Silva. (*See id.*) According to the letter, Fuentes was ultimately suspended, *inter alia,* for "conducting 'union' ... business on work time without permission" and "engaging in conduct under the guise of an investigation that was reckless and damaging to the reputation of a supervisor." (*See id.* at 217.)

The cited grounds for suspension can be read to apply both to Fuentes' initial conversations and his later personally-motivated inquiries. However, when viewed alongside the references to Fuentes' two initial conversations, it becomes apparent that at the very least, Fuentes' earlier conversations were a motivating factor in the suspension decision.

## V. CONCLUSION

For the reasons set forth above, the Report and Recommendation of the Magistrate Judge, upon *de novo* review, is hereby ADOPTED in its entirety. Defendants' Motion for Summary Judgment is therefore ALLOWED, except as to the First Amendment claims in Counts V, VII, and IX. The clerk will set this matter for a status conference to determine further proceedings.

It is So Ordered.

## REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### (Docket No. 37)

NEIMAN, United States Magistrate Judge.

Orlando Fuentes ("Fuentes")—an employee of the Hampden County Sheriff's Department ("Sheriff's Department" or "HCSD") and a shop steward of the International Brotherhood of Correctional Officers, Local No. 248 ("the union")—together with the union (collectively "Plaintiffs"), brings this action against the Sheriff's Department, Michael Ashe ("Ashe") in his official capacity as Sheriff, and Diane Jiminez ("Jiminez"), the Assistant Deputy Su-

perintendent of Personnel (collectively "Defendants"). Three sets of claims remain: (1) Fuentes' claim of defamation targeting Jiminez (Count III); (2) the union's civil conspiracy claim targeting the Sheriff's Department (Count X); and (3) various constitutional—*i.e.*, First and Fourteenth Amendment—claims directed at all three defendants in their official capacities (Counts V, VII and IX).[3]

Defendants' motion for summary judgment has been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons which follow, the court will recommend that Defendants' motion should be allowed with respect to all the claims but one portion of Plaintiffs' First Amendment causes of action.

## I. BACKGROUND

For summary judgment purposes, the following facts as set forth in Defendants' Local Rule 56.1 Statement are undisputed. As necessary, further facts will be addressed in the court's discussion below. Still further background facts can be found in this court's June 30, 2003 Report and Recommendation Regarding Defendants' Motion to Dismiss ("Rep. & Rec.") and Judge Ponsor's June 25, 2004 Memorandum and Order with respect thereto ("Mem. & Order").

5. In late July of 2002, Fuentes heard a rumor that a certain Primary Captain was engaging in sexual harassment.

6. Fuentes asked questions of other employees concerning the Primary Captain's management style in an attempt to determine the validity of these rumors.

---

**3.** On June 25, 2004, District Judge Michael A. Ponsor, adopting this court's report and recommendation in part, dismissed the other claims, namely, intentional infliction of emotional distress (Count I), intentional interfer-

ence with contractual relations (Count II), violation Fuentes' right to privacy (Count IV), violations of the Massachusetts Civil Rights Act and the Whistleblower Act (Counts VI and VIII), and breach of contract (Count XI).

7. After the inquiries, Fuentes determined that there was not enough information to continue any more "frank discussions" or report the matter to management.

. . . .

9. Additionally, Fuentes discussed the rumor with Kathy Silva [ ("Silva") ], a co-worker and member of the union board.

10. On or about July 8, 2002, Sergeant Derek Woods [ ("Woods") ] overheard Silva discussing the rumor with another co-worker.

11. Thereafter, . . . Woods reported the rumor to Assistant Deputy Superintendent John Kenney [ ("Kenney") ], who, a few days later, requested that . . . Woods complete a written incident report regarding the incident.

12. On or about July 12, 2002, . . . Kenney notified Jiminez that there was an allegation about the Primary Captain.

13. Jiminez proceeded to investigate the rumor by conducting meetings on July 25, 2002, and August 7, 2002, which included herself, Fuentes, Silva, . . . Kenney, and a union representative.

14. Fuentes and Silva gave conflicting statements during the meetings.

15. On August 16, 2002, Fuentes received a suspension letter (Letter) from Jiminez.

16. The Letter, in part, stated that "[b]ased upon your failure to follow the clear contract immediate reporting requirement,[4] your lack on candor during the investigation, your conducting 'union' or personally motivated business on work time without permission and engaging in conduct under the guise of an investigation that was reckless and damaging to the reputation of a supervisor, I am issuing a five (5) day suspension without pay . . . ."

(Defs.' Facts ¶¶ 5–16.)

## II. STANDARD OF REVIEW

"Summary judgment is warranted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Uncle Henry's, Inc. v. Plaut Consulting Co.,* 399 F.3d 33, 41 (1st Cir.2005) (quoting Fed. R. Civ. Pro. 56(c)). "An issue is 'genuine' for purposes of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Carcieri v. Norton,* 398 F.3d 22, 29 (1st Cir.2005) (citations and further internal quotation marks omitted).

## III. DISCUSSION

As indicated, the remaining claims fall into three categories: (1) Fuentes' defamation claim, (2) the union's civil conspiracy claim, and (3) the constitutional claims, *i.e.,* the claims alleging free speech (First Amendment) and due process (Fourteenth Amendment) violations. In the end, the court will recommend that summary judgment should enter in Defendants' favor with respect to all the claims but one portion of Plaintiffs' First Amendment causes of action.

---

4. In pertinent part, Article 5, Section 3 of the collective bargaining agreement ("CBA") states that "[e]mployees who . . . have information about an incident or incidents of sexu- al harassment must report same in writing immediately." (Defs.' Facts, included within Document No. 37 ("Defs.' Brief"), ¶ 8.)

## A. *Defamation (Count III)*

 The parties agree that, in Massachusetts, "defamation" is "the intentional or reckless publication, without privilege to do so, of a false statement of fact which causes damages to the plaintiff's reputation." *Elicier v. Toys "R" Us, Inc.*, 130 F.Supp.2d 307, 310 (D.Mass.2001). According to Defendants, Jiminez's suspension letter was not defamatory because she had a conditional privilege to circulate the letter to select individuals in upper management and the union. *See Foley v. Polaroid Corp.*, 400 Mass. 82, 94, 508 N.E.2d 72 (1987) ("An employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job."). Not unsurprisingly, Plaintiffs disagree. In the court's view, Defendants' position is more persuasive.

As a preliminary matter, it should be noted that Fuentes' claim against Jiminez has never been strong. When Judge Ponsor originally denied Defendants' motion to dismiss the claim, he commented that, while "it *might* be argued [as Fuentes argued] that no privilege existed to protect [Jiminez's statements] because they were recklessly made and published to various individuals both within and outside the Sheriff's Department[,] ... it would be *premature* to dismiss the defamation claim." (Mem. & Order at 7 (emphasis added).) Accordingly, Judge Ponsor continued, the issue could be revisited at the close of discovery upon a motion for summary judgment. (*Id.*) Now is that time.

In their motion for summary judgment, Defendants cite a variety of statements from Fuentes' deposition which, in this court's view, establish that Jiminez's actions were privileged as a matter of law, *i.e.*, that she published the suspension let-ter only to "a narrow group of individuals who share[d] a common interest in the communication." *Masso v. United Parcel Serv. of Am.*, 884 F.Supp. 610, 622 (D.Mass.1995). For example, Fuentes acknowledged that receipt of the letter by certain HCSD officials was part of the department's "standard operating procedure." (Defs.' Facts ¶ 33.) Fuentes also stated that he had no objection to the union getting a copy of the suspension letter. (*Id.*) Further, and perhaps most importantly, Fuentes conceded that the letter was not "sent to anybody who should not have been copied on it." (*Id.*) Since Plaintiffs do not dispute these facts, they are deemed admitted. *See* Local Rule 56.1. Plaintiffs' unsupported allegation that "[t]he suspension letter was distributed to the very people who hold the key to favor (or disfavor) in the upper ranks of the HCSD" (Pls.' Brief at 10) adds nothing to the analysis.

In addition, Judge Ponsor, like Defendants here, noted that "[t]ypically, the [allegedly defamatory] statement must 'discredit the plaintiff in the minds of any considerable and respectable segment of the community.'" (Mem. & Order at 5 (quoting *Draghetti v. Chmielewski*, 416 Mass. 808, 626 N.E.2d 862, 866 (Mass. 1994)).) Unfortunately for his cause, Fuentes' deposition testimony—in which he "admitted that he could not name a single individual who believed that [his] reputation had been diminished as a result of the suspension letter" (Defs.' Facts ¶ 34)—is fatal to his defamation claim. For these reasons, therefore, the court will recommend that summary judgment should enter in Jiminez's favor on Count III.

## B. *Civil Conspiracy (Count X)*

 Although the civil conspiracy claim is brought by the union, Plaintiffs

acknowledged at oral argument that Fuentes is the only union witness produced for deposition in support of this claim. Fuentes' deposition testimony, however, fails to support the union's cause in any respect. Fuentes "admitted he had no evidence or information or any type of conspiracy between the defendants regarding his discipline." (Defs.' Facts ¶ 31.) This fact—which, if accurate, would clearly dispose of the union's civil conspiracy claim—is undisputed and, therefore, is deemed admitted. *See* Local Rule 56.1.

To be sure, Plaintiffs note that Jiminez, at her deposition, vaguely stated: "No, we think we squashed *it.*" However, even assuming that "we" meant the defendants and "it" meant the sexual harassment rumor, Jiminez's statement is too tenuous, in the court's view, to allow the union's civil conspiracy claim to survive. *See Brown v. Armstrong,* 957 F.Supp. 1293, 1305 (D.Mass.1996) ("Civil conspiracy is recognized as 'a very limited cause of action in Massachusetts.'") (quoting *Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1563 (1st Cir.1994)). Accordingly, the court will recommend that summary judgment should enter in Defendants' favor on Count X.[5]

## C. Constitutional Claims (Counts V, VII and IX)

The constitutional claims consist of Fuentes' due process and First Amendment claims (Counts V and VII) as well as a First Amendment claim brought "vicariously" by the union (Count IX). (See Document No. 39, "Pls.' Brief," at 11–13.) The parties do not separately address the union's vicarious First Amendment claim. (See *id.;* Defs.' Brief at 10–23.) Accord-

ingly, the court, too, will consider the union's constitutional claim as part of Fuentes' First Amendment cause of action.

### 1. Due Process

At the motion to dismiss stage, the core due process issue was whether Fuentes was required to exhaust his state administrative remedies as a prerequisite to bringing an action under section 1983. Following *Patsy v. Bd. of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) and this court's recommendation, Judge Ponsor found that no such exhaustion was required. (Mem. & Order at 10–11.) Judge Ponsor went on to note, however, that "*Patsy* may prove irrelevant if the defendants can ultimately show that 'the grievance procedures contained in the [CBA] provide[d] whatever process ... [was] due as a matter of federal law.' *Narumanchi v. Bd. of Trustees,* 850 F.2d 70, 72 (2d Cir.1988)." (*Id.* at 11.) In addition, Judge Ponsor continued, "the due process claim must be dismissed if, after discovery, it materializes that there is no official policy or custom which caused Constitutional injury to Fuentes. *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (no due process claim against municipality or official without policy or custom)." (*Id.* at 11 n. 3. See also Rep. & Rec. at 17 (same).) In this court's estimation, that is exactly what has developed here, *i.e.,* there is no evidence of an official ruling or custom with respect to due process which caused Fuentes to be injured.

Defendants have asserted as a matter of fact that, "[a]t his deposition, Fuentes admitted there is absolutely no evidence of an official policy at the HCSD for depriv-

---

5. The court makes this recommendation without considering Defendants' alternative argument that Count X should be dismissed for lack of subject matter jurisdiction as the sole

avenues for relief under Mass. Gen. L. ch. 150E are the Massachusetts Labor Relations Board and binding arbitration.

ing people of the[ir] civil rights." (Defs.' Facts ¶ 31.) Plaintiffs have offered no evidence to rebut this fact and it remains undisputed.[6] Plaintiffs also do not dispute the following paragraphs from Defendants' Local Rule 56.1 Statement which, together, demonstrate that Fuentes' was afforded all the process that was due:

18. A Step 3 grievance hearing was held at the HCSD on September 12, 2002.

19. The Union's attorney interrupted the hearing, stating that he would make the presentation to the Sheriff on Fuentes' behalf and that Fuentes "would not be speaking."

20. The hearing was ended when Fuentes decided that he would not speak on his own behalf.

21. After the Step 3 hearing, Fuentes decided to go to court rather than to proceed to a Step 4 arbitration pursuant to the CBA.

(Defs.' Facts ¶¶ 18–21.) In the end, the court finds no due process violation and will recommend that summary judgment enter in Defendants' favor with regard to Fuentes' Fourteenth Amendment allegations in Counts V and VII.

### 2. *First Amendment*

The most hotly contested claims are Plaintiffs' allegations that Defendants violated Fuentes' free speech rights under the First Amendment. These claims survived Defendants' motion to dismiss. Still, the question remains, now that discovery has been completed, as to "whether Fuentes' speech involved a matter of pub-

lic concern." (Rep. & Rec. at 13.) In addition, the court has to consider "the relative strength of Fuentes' First Amendment interests compared to Defendants' interest in the efficient performance of the workplace," the so-called *"Pickering* balancing test." (*Id.* at 15–16.) Finally, assuming the balance favors Fuentes, he must also show that his speech " 'was a substantial or motivating factor in an adverse employment action.' *Tang v. Rhode Is. Dep't of Elderly Affairs*, 163 F.3d 7, 12 (1st Cir.1998)." (*Id.* at 13.) The court will address each question in turn.

### a. *whether Fuentes' speech involved a matter of public concern*

Two items compelled this court to suggest at the motion to dismiss stage that Fuentes' speech may have involved a matter of "public concern." First, it appeared to the court that Fuentes may have been engaging in non-personal, union activities. (See *id.*) Second, the court found it "significant that Fuentes' [speech] involved alleged sexual harassment." (*Id.* at 14.) At the time, Judge Ponsor agreed that a public concern was involved, at least for purposes of the motion to dismiss. (See Mem. & Order at 10.) Presently, in the court's view, the summary judgment record leads to essentially the same conclusion.

In order to determine whether Fuentes' speech involved a matter of public concern, the court must first identify the speech. This has not been an easy task insofar as Plaintiffs' summary judgment brief contains numerous errors.[7] Nonetheless, the

---

**6.** Again, as with the conspiracy claim, Plaintiffs argue in their brief that there was a concerted effort to "squash" Fuentes' speech. But, as stated previously, there is insignificant evidence to support this argument.

**7.** For example, Plaintiffs fail to respond to Defendants' detailed factual statement. In

turn, Plaintiffs' "Summary of Facts," is mostly unsupported and too often tinged with an inappropriate slant. (See, *e.g.*, Pls.' Brief at 5 (claiming, as a fact, that Jiminez's letter "contains baldly asserted conclusions of damning motive and a parade of damages suffered upon the Primary Captain").) Plaintiffs' "Argument," as set forth in their brief, is likewise

court will not impute counsel's errors upon Plaintiffs themselves. *See Jackson v. Beech,* 636 F.2d 831, 837 (D.C.Cir.1980) (noting that when confronting dispositive motions "courts have been reluctant to attribute to the parties the errors of their legal representatives") (citation and internal quotation marks omitted). Accordingly, the court itself, guided by the parties at oral argument, has dug into the record in order to precisely identify the two types of "speech" at issue: (1) Fuentes' discussions with a male officer and Silva concerning a sexual harassment rumor about a Primary Captain; and (2) Fuentes' subsequent inquiry of other workers about the Primary Captain's management style. Ultimately, the court believes, the first category of speech but not the second involved a matter of public concern.

#### (i) *the rumor*

In the court's view, Fuentes' discussions with the male officer and Silva concerning the sexual harassment "rumor" involved a matter of public concern. The facts surrounding this speech follow.

At his deposition, Fuentes testified that a male officer, whose name he could not recall, asked him: "[W]hat should a female officer do if ... sexual harassment or [a] derogatory statement about a radio in her back pocket was made by a supervisor"? (Document No. 38, "Defs.' Appx.," at 182.) According to Fuentes, the male officer "described the alleged incident as [the supervisor] telling a female officer 'Take your radio out of your back pocket[;] it's blocking or ruining my view.'" (*Id.* at 183.) In response, Fuentes "told [the male officer] if it did happen—because by the way he asked the question, he wasn't present for it either—I said it needs to be reported."

(*Id.* at 182.) "If that female officer is afraid because it deals with a supervisor," Fuentes continued telling the male officer, "she can turn it into the union board and they will forward it to. administration for her." (*Id.*) Thereafter, Fuentes briefly discussed the matter with Silva who was a member of the union's executive board:

> To the best of my recollection, I spoke to [Silva], I think it was on my way to lunch or something of that manner[,] and I explained to her because I told an officer that, you know, if the officer who was allegedly wronged or harassed has reported it to [the] union board because it's never happened before that if they saw a report concerning that issue, to let everybody else on the board know that they need to forward that to the administration, and I explained to her what the report would have been about.

(*Id.* at 184.)

As in its earlier Report and Recommendation, the court believes that Fuentes' speech with regard to the rumor involved a matter of public concern. (Rep. & Rec. at 13.) First, as the court originally observed, "it appears that union activities, unless purely personal, often constitute matters of public concern." (*Id.* at 13–14 (citing *Smith v. Arkansas State Highway Employees, Local 1315,* 441 U.S. 463, 465, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (the First Amendment protects the rights of public employees to join together as a union); *Gregorich v. Lund,* 54 F.3d 410, 415 (7th Cir.1995) (effort to unionize employees went beyond self interest and was matter of public concern); *Boddie v. City of Columbus,* 989 F.2d 745, 750 (5th Cir. 1993) ("much more of the range of [union] activity than the range of employee speech ... is inevitably of public concern");

defective; it contains scant case law and includes several incomprehensible sentences. (See, *e.g., id.* at 12 ("Here one work expect a rules is rules argument with emphasis on a paramilitary nature of the organization." [Sic] ).)

*Monks v. Marlinga*, 923 F.2d 423, 424 (6th Cir.1991) (union activities deemed matter of public concern, particularly at motion to dismiss stage)).) Now, as it turns out, Fuentes' speech to both the male officer ("she can turn it into the union board") and to Silva (a member of the union's executive board) fell under the auspices of union, not personal, activity. *Compare Meaney v. Dever*, 326 F.3d 283, 289 (1st Cir.2003) (blowing horn in order to irritate mayor after union picketing had concluded was a personal expression and, thus, not a matter of public concern).

Second, the court continues to deem it "significant that Fuentes' [speech] involved alleged sexual harassment." (Rep. & Rec. at 14.) "Granted," as previously indicated, "the court does not believe ... that *any* discussion of sexual harassment rumors by a public employee would be entitled to constitutional protection, particularly if the rumors turn out to be false." (*Id.* at 14 (citing *Rankin v. McPherson*, 483 U.S. 378, 384–85, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) ("Whether employee speech addresses a matter of public concern must be determined by the content, form, and context of a given statement.")).) But Fuentes' speech, particularly when viewed in its union context, was hardly water cooler gossip; it was about reporting potential sexual harassment by a supervisor and the proper chain of command with respect thereto. As described previously, there is ample support in the case law that similar speech involving sexual harassment or discrimination in the workplace may legitimately constitute a matter of public concern. *See, e.g., Hall v. Missouri Highway & Transp. Comm'n*, 235 F.3d 1065, 1067–68 (8th Cir.2000) (employee's complaint of an overall pattern of discrimination against women related to a matter of public concern); *Marshall v. Allen*, 984 F.2d 787, 796 (7th Cir.1993) (plaintiff's defending employees who had accused supervisor of

sexual harassment constituted a matter of public concern); *Gray v. Lacke*, 885 F.2d 399, 411 (7th Cir.1989) (employee's complaints about sexual harassment on the job were matters of public concern and, in fact, "sexual harassment may inherently be a matter of public concern"). *See also Bonnell v. Lorenzo*, 241 F.3d 800, 812–13 (6th Cir.2001) (professor's circulation of student's sexual harassment complaint with name of student redacted in order to attack school's sexual harassment policy was a matter of public concern). *Cf. Connick v. Myers*, 461 U.S. 138, 147 n. 8, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (stating, in dicta, that a public employee's "right to protest racial discrimination" is "a matter inherently of public concern"); *Bennett v. City of Holyoke*, 230 F.Supp.2d 207, 224 (D.Mass.2002) (observing that "statements made by [city police officer] regarding corruption and racism within the ... police department were on matters of public concern") (emphasis in original), *aff'd*, 362 F.3d 1 (1st Cir.2004).

(ii) *the inquiry*

On the other hand, the court does not believe that Fuentes' subsequent "inquiry" about the Primary Captain was a matter of public concern. "At his deposition, Fuentes admitted several times that he was not acting in his union capacity when he discussed the Primary Captain with other staff." (Defs.' Facts ¶ 25.) He also admitted "that his inquiry was 'personally motivated' and 'not union related.'" (*Id.* ¶ 26.) He stated as well that his inquiry concerning the Primary Captain's "management style" was meant "to satisfy his own personal curiosity, because he had to work with the Primary Captain for a short period of time." (*Id.* ¶ 27.) In short, unlike his prior discussions with the male officer and Silva, Fuentes' "inquiry" was purely personal and, therefore, not a mat-

ter of public concern entitled to First Amendment protection. *See City of San Diego v. Roe,* 543 U.S. 77, 125 S.Ct. 521, 525, 160 L.Ed.2d 410 (2004) ("[A] public employee's speech is entitled to *Pickering* balancing only when the employee speaks as a citizen upon matters of public concern rather than as an employee upon matters only of personal interest.") (citation and internal quotation marks omitted); *Blum v. Schlegel,* 18 F.3d 1005, 1012 (2d Cir. 1994) (holding that speech will not be protected if "the employee's motive for the speech is private and personal"). *See also Alinovi v. Worcester Sch. Comm.,* 777 F.2d 776, 787 (1st Cir.1985) (concluding that speech found to be motivated by a purely personal issue did not implicate matter of public concern, notwithstanding attenuated connection of speech to incident raising constitutional concerns).

b. Pickering *balancing test*

With regard to the second question—the relative strength of Fuentes' First Amendment interests compared to Defendants' interest in the efficient performance of the workplace, *see Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)—Defendants argue that their interest in "following the CBA, maintaining staff respect and discipline, and limiting unauthorized investigations" trumps Fuentes' "right to conduct 'frank discussions' about a Primary Captain's ... alleged sexually harassing behavior." (Defs.' Brief at 15.) The court respectfully disagrees.

First, as to the relative strength of Fuentes' First Amendment interests, the court repeats that the only "discussions" he appears to have had about the Primary Captain's alleged sexually harassing behavior were his initial conversation with the unnamed male officer and his subsequent report to Silva, a member of the union's executive board. As described, those conversations were not rumor-mongering. *Compare Mulvihill v. Top–Flite Golf Co.,* 335 F.3d 15, 21 (1st Cir.2003). Rather, as indicated, their focus was the union and administrative avenues available to a female officer for reporting the potential abuse of authority by a male supervisor. Such facts are quite significant in the *Pickering* balance. *See Guilloty Perez v. Pierluisi,* 339 F.3d 43, 53 (1st Cir.2003) (noting that the "substantial public interest" in reports and observations regarding supervisors' misconduct "heavily weight[s] the *Pickering* scale in favor of First Amendment protection"); *Boddie,* 989 F.2d at 750 (observing the "reality that speech in the context of union activity will seldom be personal"); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999) (finding union activity entailing substantial criticism of managers to outweigh employer's interest in the efficiency of its services).

Second, with regard to Defendants' countervailing interests, it is true that "[t]he importance of discipline, maintenance of harmony among co-workers, and close working relationships requiring personal loyalty and confidence is greater in the context of a law enforcement agency ... than it might be in another type of government agency." *Guilloty Perez,* 339 F.3d at 53. The burden, however, is on Defendants to show that actual work disruptions occurred because of Fuentes' speech, *see id.* at 54, and, in the court's estimation, they have not done so for present purposes.

Finally, the court is not convinced that Fuentes' conduct "violated the [Defendants'] internal policy as expressed in [the CBA]." *Fabiano v. Hopkins,* 352 F.3d 447, 456 (1st Cir.2003). Granted, the CBA required employees who have "information about an incident or incidents of sexual harassment" to "report same in writing

immediately." (See *supra* at n. 2.) But the CBA does not appear to bar employees from doing what Fuentes allegedly did here: listen to the allegations and then discuss reporting requirements with his source as well as with a member of the union's executive board.

At bottom, the court is mindful of the words of the Supreme Court nearly two decades ago: "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin*, 483 U.S. at 384, 107 S.Ct. 2891. Accordingly, the court believes, the *Pickering* balance presently favors Fuentes. *See Rivera–Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir.2004) (deeming the issue of "whether a defendant's claim of potential disruption is reasonable" a "disputed question[ ] of fact" inappropriate for resolution at summary judgment) (citation omitted).

 c. *whether Fuentes' speech was a substantial or motivating factor in an adverse employment action*

In the court's estimation, the third factor—that the protected expression was a substantial or motivating factor in the adverse employment action—can be dealt with in short order. Fuentes was suspended, *inter alia*, for "engaging in conduct under the guise of an investigation that was [purportedly] reckless and damaging to the reputation of a supervisor." The suspension letter also cited his ostensibly "conducting union ... business on work time without permission." Accordingly, it appears that a motivating—if not a substantial—factor for the suspension was Fuentes' protected expression. At the very least, Plaintiffs ought to be able to challenge the constitutionality of such discipline at trial. *See Rivera Jimenez*, 362 F.3d at 94 (observing that third factor may not be determinable as a matter of law where there are material facts in dispute). Accordingly, the court will recommend that Defendants' motion with respect to Plaintiffs' First Amendment claims, to the extent those claims are grounded in his discussions with the male officer and Silva, be denied.

## IV. Conclusion

For the reasons stated, the court recommends that Defendants' motion for summary judgment be DENIED with respect to Fuentes' First Amendment claims contained in Counts V and VII and the union's vicarious First Amendment claim contained in Count IX, but only insofar as those claims involve Fuentes being disciplined for discussing the so-called sexual harassment "rumor." In all other respects, the court recommends that Defendants' motion for summary judgment be ALLOWED.[8]

September 15, 2005.

---

**8.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule

shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.